# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

|  |  |
|---|---|
| **WELLELA HIRPASSA,** | * |
|  | * |
|  | * |
| Plaintiff, | * |
|  | *       Case No.: RWT 09cv2631 |
| v. | * |
|  | * |
| **PRINCE GEORGE'S COUNTY,** | * |
| **MARYLAND, ET AL.,** | * |
|  | * |
| Defendant. | * |
|  | * |
|  | *** |

## MEMORANDUM OPINION

Prince George's County, Maryland (the "County"), and County Police Corporals Delvon Montue, Troy Wallace, Louis Williams, and Thomas Hammill[1] (the "Officer Defendants"), have moved to dismiss, or, in the alternative, for summary judgment in their favor in response to a Complaint filed against them by Plaintiff Wellela Hirpassa. Because there are no genuine issues of material fact on the relevant questions and the defendants are entitled to judgment as a matter of law, the Court will, by separate order, grant the motion for summary judgment.

On July 27, 2009, Plaintiff Wellela Hirpassa,[2] proceeding *pro se*, filed a Complaint [Paper No. 2] against the County[3] and the Officer Defendants in the Circuit Court for Prince George's County, Maryland. Generally, the Complaint alleged that the Officer Defendants

---

[1]   Cpl. Hammill has since been promoted to Sgt. Hammill. (*See* Defs.' Mot. 2.)

[2]   Plaintiff sues on her own behalf, and as the personal representative of the estate of her son, Brook T. Genet, and on behalf of Ruby Brook and Beshaan Brook, her grandchildren – children of the decedent. (*See* Compl.) Plaintiff's name in the Complaints is spelled "Wellela Hirpassa," but is often spelled in both the Defendants' and the Plaintiff's papers as "Wellella Hirpassa." (*Compare* Third Am. Compl. *with* Memorandum in Support of Defs.' Mot. 1 [Paper No. 22-1] *and* Pl.'s Opp'n 1 [Paper No. 29].) The Court will use "Wellela Hirpassa."

[3]   Plaintiff originally named "Prince George's County Government" as a defendant, but has since renamed the County: "Prince George's County, Maryland," in accord with the County Charter. *See* Prince George's County, Md., Charter § 103. (*Compare* Compl., First Am. Compl. *and* Second Am. Compl. *with* Third Am. Compl.)

employed excessive force when they shot and killed Plaintiff's son, Brook T. Genet, on August 5, 2008. Plaintiff sought monetary damages from the Officer Defendants and the County.

The County and the Officer Defendants removed the action from the County Circuit Court to this Court on October 7, 2009 (*see* Notice of Removal [Paper No. 1]), shortly after Plaintiff filed her Amended Complaint [Paper No. 7], to include a federal claim under 42 U.S.C. § 1983. The Officer Defendants answered the Amended Complaint on October 16, 2009. (*See* Officer Defs.' Answer to Pl.'s First Am. Compl. [Paper No. 13].) Plaintiff then sought leave to amend her Complaint a second time, which was granted, and the Second Amended Complaint [Paper No. 18] was filed December 8, 2009. The Second Amended Complaint added defendants Asmorom Berhe and Adrien Lyle Robinson (the "Civilian Defendants").[4]

The County and the Officer Defendants moved to dismiss the Second Amended Complaint, or, in the alternative, for summary judgment in their favor on February 12, 2010 (the "Motion" [Paper No. 22]). In response, Plaintiff sought leave to amend her complaint a third time, which was granted (*see* Order Granting Mot. for Leave to File Third Am. Compl. [Paper No. 27]), with the proviso that the pending Motion would be treated as a motion to dismiss the Third Amended Complaint, or, in the alternative, for summary judgment. The Third Amended Complaint [Paper No. 28] was then filed on March 19, 2010. Plaintiff opposed the Motion on the same day (*see* Pl.'s Opp'n [Paper No. 29]), and the County and the Officer Defendants replied in support of their Motion shortly thereafter (*see* Defs.' Reply [Paper No. 30]). Subsequently,

---

[4] Plaintiff sought leave to serve the Civilian Defendants by publication in the Washington Post [Paper No. 20], after her process server returned the summonses unexecuted – unable to personally serve the Civilian Defendants. (*See* Pl.'s Mot. for Alternative Service [Paper No. 20] ¶ 4.) That motion was denied [Paper No. 21], and there remains no proof of service or waiver of service for the Civilian Defendants on the docket. Plaintiff's time to serve the Civilian Defendants has since elapsed. *See infra* Analysis Part IV.

Plaintiff sought leave to file a surreply. (*See* Mot. for Leave to File Surreply [Paper No. 32].) Plaintiff's motion to file her surreply is granted in the order accompanying this opinion.

## BACKGROUND FACTS

### I.     The Civilian Defendants Seek Out Mr. Genet

In the late afternoon of Monday, August 4, 2008, Asmorom Berhe[5] sought to recover a rental car he had lent to Brook Genet.[6] (*See* Defs.' Mot. Ex. 4 ("Berhe Interview").) Mr. Berhe had rented the Dodge Avenger for Mr. Genet the previous Friday so Mr. Genet could provide transportation to his daughter over the weekend. (*Id.* at ¶¶ A3, A6; *accord* Defs.' Mot. Ex. 3 lines 44-49, 64-65 ("Robinson Interview").) The car was due for return to Enterprise Rent-A-Car in Takoma Park, Maryland, that Monday morning. (*See* Berhe Interview ¶¶ A4, A6; Robinson Interview lines 49-50.) Instead of returning the car, Mr. Genet paid for an extension of the rental period, but left the rental in Mr. Berhe's name because Mr. Genet did not have a driver's license. (*See* Berhe Interview ¶¶ A5-A7; Robinson Interview lines 53-55, 65-71.) Mr. Berhe did not approve of this extension, and he tried to contact Mr. Genet by phone to demand the keys back for some time, before reporting the car stolen to the County Police. (*See* Berhe Interview ¶¶ A8-A10, A14.) Later in the afternoon Mr. Berhe summoned Adrien Lyle Robinson to come with him to Mr. Genet's apartment at 3417 Toledo Terrace, Hyattsville, Maryland, to demand the return of the car. (*See* Berhe Interview ¶ A11; Robinson Interview lines 39-45.)

---

[5]  Defendant Berhe is sued as "Asmorem Berhe" and referred to in the Motion as "Asmoron Behre;" however, in the statement given to the Prince George's County Police on August 5, 2008, signed by Mr. Berhe, his name is spelled "Asmorom Berhe." (*Compare* Third Am. Compl. *and* Defs.' Mot. 1 *with id.* at Ex. 4, *id.* at Ex. 1 ¶ 4 *and id.* at Ex. 2 at 3.) The Court will use "Asmorom Berhe."

[6]  Decedent "Brook T. Genet" is so named in the Complaint and his autopsy report; however, he is also referred to as "Brooke Genet," "Brook Gentee" and "Brooke Genete." *Compare* Third Am. Compl. *and* Defs.' Mot. Ex. 14 *with id.* at 1, *id.* at Ex. 1 ¶ 2, *id.* at Ex. 2 at 3, *id.* at Ex. 8 at 1.) The Court will use "Brook Genet."

When they arrived at Mr. Genet's apartment at around 7:00 p.m., he refused to answer the door, and shouted at them to go away. (*See* Berhe Interview ¶ A12; Robinson Interview lines 93-100.) Mr. Berhe called the County Police, who arrived around 7:30 p.m. and advised Mr. Berhe they could not help without obtaining a warrant for Mr. Genet, which Mr. Berhe did not want them to do. (*See* Berhe Interview ¶¶ A13, A15-A16; Robinson Interview lines 103-24.) Messrs. Berhe and Robinson found the car, but neither they nor the Police could do anything with it, short of Mr. Berhe paying to have it towed. (*See* Berhe Interview ¶ A17; Robinson Interview lines 124-52.) After the Police left, Mr. Berhe, out of frustration, returned to Mr. Genet's apartment, with Mr. Robinson a short distance behind, to renew his demand for the keys from Mr. Genet. (*See* Berhe Interview ¶¶ A17-A20; Robinson Interview lines 153-58.)

At the apartment, Messrs. Berhe and Robinson saw through the apartment window that Mr. Genet was carrying a gun, which he waved at Mr. Berhe while yelling at him to go away. (*See* Berhe Interview ¶¶ A21-A29; Robinson Interview lines 162-64, 186-92.) After Mr. Berhe and Mr. Genet shouted at one another for some time, according to Mr. Berhe, Mr. Genet fired once towards Mr. Berhe, missing him. (*See* Berhe Interview ¶¶ A30-A35.) According to Mr. Robinson, Mr. Genet fired once, missing Mr. Berhe but inciting a renewed shouting match, which ended in Mr. Genet firing again, missing Mr. Berhe once more. (*See* Robinson Interview lines 206-57.) Mr. Robinson saw the muzzle flash and smelled gunpowder after the shot was fired. (*Id.* at lines 220-40, 273-74.) Mr. Berhe then gave up the argument, leaving to go to his brother's home while Mr. Robinson told neighbors to stay inside their apartments and called County Police to report the shots fired by Mr. Genet. (*See* Berhe Interview ¶ A36; Robinson Interview lines 257-80.) According to the County Police, they received more than one call about the gunshots in the area. (*See* Defs.' Mot. Ex. 2 at 1 ("Investigation Summary").)

## II.     The Police Operation Begins

County Police soon arrived and spoke with Mr. Robinson, who directed them to Mr. Genet's apartment. (*See* Robinson Interview lines 280-93.) The record before the Court does not pinpoint the time at which Police were called, nor exactly how their operation unfolded over the course of the night. At some point early on, a sergeant deemed the situation a "barricade." (*See* Investigation Summary 1.) Around 10:30 p.m. witnesses stated that the area was already under the control of the Police, and some people were asked to stay in their homes. (*See* Pl.'s Opp'n Ex. 2 lines 26-34 ("Acosta Interview"); Pl.'s Opp'n Ex. 3 lines 30-33 ("Blide Interview"); (Pl.'s Opp'n Ex. 4 lines 142-64 ("Styles Interview").) Also around that time, members of the County Police's Special Operations Division were paged to respond to the area. (*See* Defs.' Mot. Ex. 8 lines 57-65 ("Montue Interview"); Defs.' Mot. Ex. 11 lines 67-71 ("Hammill Interview").)

The Special Operations Division of the County Police includes a "Tactical Unit" consisting of squads of officers that function as a "SWAT Team." (*See* Hammill Interview lines 49-53.) All four of the Officer Defendants are members of the Special Operations Division Tactical Unit. (*See* Investigation Summary 2-3; *accord* Montue Interview lines 72-74; Hammill Interview lines 40-43; Defs.' Mot. Ex. 9 lines 44-46 ("Wallace Interview"); Defs.' Mot. Ex. 10 lines 39-41 ("Williams Interview").) Each of the four officers played different roles in the evening's operation, discussed *infra*, Background Facts Part III. The Police set up a "staging area" in the parking lot of the Prince George's County Plaza shopping mall, including a Police Emergency Services Team truck, as well as fire and emergency medical teams. (*See* Williams Interview lines 85-104; Hammill Interview lines 139-46; Defs.' Mot. Ex. 12 lines 35-46 ("Keiffer Interview").)

The Special Operations Division deployed by surrounding 3417 Toledo Terrace, particularly in front where Mr. Genet's apartment opened onto a courtyard. (*See* Montue Interview lines 117-22, 152-74, 254-58; Wallace Interview lines 127-76; Williams Interview lines 110-35; Hammill Interview lines 278-84.) About eight officers approached the building in a "Bearcat" armored vehicle, including Defendant Hammill. (*See* Hammill Interview lines 278-99; Defs.' Mot. Ex. 5 lines 42-47 ("Abuelhawa Interview"); Defs.' Mot. Ex. 6 lines 135-54 ("D'Ambrosi Interview").) Another two officers approached the building in a "V-100" armored personnel carrier, which had a "boom" affixed to the front to serve as a battering ram. (*See* D'Ambrosi Interview lines 26-36; Defs.' Mot. Ex. 7 lines 33-42 ("Sprague Interview").)

A small group of officers including Defendants Montue, Wallace and Williams held a position on the front-left corner of the building. (*See* Montue Interview lines 152-82, 213-58; Wallace Interview lines 158-76; Williams Interview lines 123-35.) Opposite them, on the front-right corner of the building, were officers and Police negotiators with a public address system, who tried to engage Mr. Genet in communication during the standoff. (*See* Abuelhawa Interview lines 81-99; Hammill Interview lines 347-52, 415-28; Blide Interview lines 48-117.) Over the course of the night Mr. Genet did not respond to Police, doing little but pacing through the apartment, sometimes withdrawing into the bathroom for long periods of time and often displaying his gun, a Browning CZ83 9mm handgun, for Police to see. (*See* Abuelhawa Interview lines 47-79, 101-43; Hammill Interview lines 305-45; Investigation Summary 4.)

### III.    The Officer Defendants

After receiving a page to respond to the scene on Toledo Terrace, Cpl. Montue drove to the staging area at Prince George's Plaza and was briefed by Sgt. D'Ambrosi. (*See* Montue Interview lines 113-115.) After receiving direction from Sgt. D'Ambrosi and another officer,

Cpl. Montue dressed and equipped himself with his "tactical gear" including an armored vest and helmet, a Heckler & Koch MP5 machine gun and a Beretta 9 mm handgun, both with lights attached. (*See* Montue Interview lines 89-111, 184-211, 487-554; Investigation Summary 2.) Cpl. Montue was assigned to hold a position on side "2" of 3417 Toledo Terrace – so labeled because it was the first side clockwise from side "1," the front of the building. (*See* Montue Interview lines 152-74.) Montue was accompanied by Cpl. Pryor, and the two stood guard on the "1, 2 corner" of the building from between 11:00 p.m. and midnight until the time of the shooting. (*See* Montue Interview lines 176-182, 221-24, 254-58, 322-71.) From there they could see a Police cruiser that had been left in front of the building, and the Bearcat vehicle that pulled up to the front of the building. (*See* Montue Interview lines 226-52; Wallace Interview lines 178-86; Williams Interview lines 177-86.)

Cpls. Wallace and Williams were on duty when paged to the scene on Toledo Terrace. (*See* Wallace Interview lines 93-103; Williams Interview lines 61-63.) Cpl. Williams was leaving another assignment, and stopped at the Special Operations Division headquarters to pick up equipment. (*See* Williams Interview lines 77-83.) At the staging area, Sgt. Scott instructed Cpls. Wallace and Williams to begin by knocking on doors in the rear of 3417 Toledo Terrace, on the "3" side of the building, in order to evacuate any residents in apartments abutting Apartment D, in which Mr. Genet was barricaded. (*See* Wallace Interview lines 127-56; Williams Interview lines 110-23.) Next, Sgt. Scott instructed them to join Cpls. Montue and Pryor on the "2" side of the building to stand guard. (*See* Wallace Interview lines 158-76; Williams Interview lines 123-35.) They arrived there between midnight and 1:00 a.m., and remained until the time of the shooting. (*See* Wallace Interview lines 137-45, 173-76, 193-97; Williams Interview lines 170-75, 188-204, 246-56.)

The four officers on the "2" side of the building assigned themselves different roles in the event that Mr. Genet left his apartment and came towards them, armed or not. (*See* Wallace Interview lines 203-11; Williams Interview lines 206-19.) Because Cpl. Montue held a machine gun, he stood first in line and would use lethal force if necessary. (*See* Wallace Interview lines 207-09; Williams Interview lines 217-35.) Cpl. Pryor, armed with an electric stun gun, stood second in line and was to use "less lethal" force if appropriate. (*See* Williams Interview lines 211-15; Investigation Summary 4.) Cpls. Wallace and Williams, armed with Beretta 92FS 9mm handguns, stood third and fourth in line, respectively, and were to use lethal force if necessary, but otherwise were "hands on;" because they could more easily stow their weapons, they would run and tackle Mr. Genet if he ran towards them unarmed. (*See* Wallace Interview lines 207-08; Williams Interview lines 215-17; Investigation Summary 2-3.)

Cpl. Hammill was not in the same Squad as the other Officer Defendants. Rather, after being paged to the staging area, Cpl. Hammill joined his Squad assembling as the "entry team," under the direction of Sgt. Charles Magee. (*See* Hammill Interview lines 278-84.) Cpl. Hammill was armed with a Heckler & Koch UMP45 submachine gun. (*See* Hammill Interview lines 157-214; Investigation Summary 3.) Cpl. Hammill rode towards the apartment in the Bearcat with about seven other officers. (*See* Hammill Interview lines 286-303.) Once there, they sheltered in the Bearcat for some time, including when Mr. Genet fired his gun at the Bearcat, presumably trying to put out its spotlight. (*See* Hammill Interview lines 352-76; Abuelhawa Interview lines 115-21; Williams Interview lines 264-67.)

## IV.    The Standoff Ends

After several hours of Mr. Genet not responding to negotiators, phone calls and siren blasts, police decided between 3:00 and 4:00 a.m. to use the V-100 to break down the apartment

door, and then the large window to the left of the door. (*See* D'Ambrosi Interview lines 33-36; Sprague Interview lines 38-52; Abuelhawa Interview lines 163-73; Hammill Interview lines 392-409, 430-74; Blide Interview lines 119-86.) Sgt. D'Ambrosi and Cpl. Sprague, in the V-100, were unable to move mattresses that Mr. Genet had placed behind the window, or to break down the bathroom door, behind which Mr. Genet was hiding. (*See* D'Ambrosi Interview 40-44; Sprague Interview 52-61.) As much as an hour later, Mr. Genet emerged, appearing to survey the damage, and then stood just inside the shattered window. (*See* D'Ambrosi Interview lines 46-52; Sprague Interview 59-67; Hammill Interview lines 476-542.) When Mr. Genet came into view, Cpl. Hammill and the others exited the Bearcat – Cpl. Hammill taking a position on the left side of the Bearcat with PFC Meushah, covering the apartment window, while Cpls. Abuelhawa and Finneran took positions on the right side of the Bearcat, covering the apartment door. (*See* Hammill Interview lines 496-508; Abuelhawa Interview lines 175-201, 208-18.)

Without warning, Mr. Genet jumped from the window, holding a gun. (*See* D'Ambrosi Interview lines 52-54; Sprague Interview lines 67-69, 75-86; Blide Interview lines 192-219.) Seeing the gun, Cpl. Sprague radioed all officers that Mr. Genet was "7A" – code for armed with a gun. (*See* D'Ambrosi Interview lines 54-56; Sprague Interview lines 86-90; Wallace Interview lines 212-17; Williams Interview lines 250-62.) As soon as Cpl. Hammill saw Mr. Genet hit the ground running with a gun, Cpl. Hammill pulled his trigger. (*See* Hammill Interview lines 542-43.) Cpl. Hammill's gun jammed, and he could not immediately fix it. (*Id.* at lines 543-47.) By the time Cpl. Hammill had his handgun out, Mr. Genet was rounding the corner of the building and Cpl. Hammill did not want to fire in the direction of other officers. (*Id.* at lines 547-50.)

Mr. Genet, running to his right towards the "2" side of the building, rounded the corner and came into the view of the other Officer Defendants. (*See* D'Ambrosi Interview lines 56-61;

Sprague Interview lines 69-73; Montue Interview lines 429-43; Wallace Interview lines 216-23; Williams Interview lines 293-95, 313-20.) Cpls. Montue, Wallace and Williams saw Mr. Genet holding the gun and pointing it at them as he ran, at which time all three fired on Mr. Genet. (*See* Montue Interview lines 445-69; Wallace Interview lines 229-59, 290-305; Williams Interview lines 320-81.) Cpl. Montue, with his automatic weapon, fired 27 shots by pulling the trigger for less than two seconds. (*See* Montue Interview lines 471-523.) Cpls. Wallace and Williams, using handguns, fired two and one shots, respectively. (*See* Wallace Interview line 237; Williams Interview lines 383-403.) Mr. Genet immediately fell to the ground, dropping his gun, and the Squad from the Bearcat approached, with Sgt. Magee moving to stabilize Mr. Genet's head. (*See* Montue Interview lines 556-66; Wallace Interview lines 307-19; Williams Interview lines 405-18; Keiffer Interview lines 61-69.)

Paramedics approached next, taking over care of Mr. Genet and transporting him to the Washington Hospital Center. (*See* Keiffer Interview lines 69-93.) Mr. Genet was pronounced dead at the Hospital around 6:03 a.m., August 5, 2008. (*See* Investigation Summary 2.) An autopsy performed by the Office of the Chief Medical Examiner of the District of Columbia later that day ruled Mr. Genet's death a homicide, as a result of seven gunshot wounds. (*See* Defs.' Mot. Ex. 14 at 1-2 ("Autopsy Report").)

## **STANDARD OF REVIEW**

"If, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56." Fed. R. Civ. P. 12(d). Because both parties offer evidence to supplement the Complaint and their briefs on the Motion, the Court will consider the Motion as one for summary judgment. In evaluating a summary judgment motion, the court must assess

whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006); Fed. R. Civ. P. 56. "A party opposing a properly supported motion for summary judgment 'may not rest upon the mere allegations or denials of [her] pleadings,' but rather must 'set forth specific facts showing that there is a genuine issue for trial.'" *Bouchat v. Balt. Ravens Football Club, Inc.*, 346 F.3d 514, 522 (4th Cir. 2003) (quoting Fed. R. Civ. P. 56(e)). When ruling on a motion for summary judgment, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## ANALYSIS

Plaintiff alleges three claims against the County and the Officer Defendants: civil rights violations under 42 U.S.C. § 1983 (Counts I and IV), negligence (Count II), and wrongful death (Count III). Plaintiff alleges one claim against the Civilian Defendants: malicious prosecution (Count V). All but Count III are labeled as "survival action[s]."[7] None of these claims is cognizable for the reasons stated herein.

### I.      Civil Rights Claims (Counts I and IV)

In amending her Complaint for the third time, Plaintiff changed the cause of action in Count I to "Civil Rights Violation" from "Assault, Battery and Excessive Force." This and other changes have clouded the claim Plaintiff is trying to make. It now appears Counts I and IV are

---

[7]    In Maryland, "a survival action [is] commenced or continued by the personal representative of the deceased victim, seeking recovery for the injuries suffered by the victim and prosecuted just as if the victim were still alive." *Benjamin v. Union Carbide Corp.*, 873 A.2d 463, 480 (Md. Ct. Spec. App. 2005); *see also* Md. Code Ann., Est. & Trusts § 7-401(y). The County and the Officer Defendants allege that Plaintiff has not offered proof that she is the personal representative of Mr. Genet's estate. (Defs.' Mot. 21 n.9.) Plaintiff, however, attached the Letters of Administration of Mr. Genet's estate to the original Complaint filed in the County Circuit Court. (*See* Compl. Ex. 1.) The Letters of Administration, signed by the County Register of Wills, appoint Plaintiff the Administrator of her son's estate as of July 27, 2009. (*See id.*)

both civil rights claims, though only Count IV invokes 42 U.S.C. § 1983.[8] Taken together, the

Counts allege that:

(1)     the County violated Mr. Genet's civil rights by failing to properly train the Officer Defendants on reasonableness of force and/or "assessment of whether a criminal suspect poses a legitimate threat to safety" (Third Am. Compl. ¶ 22);

(2)     the County violated Mr. Genet's civil rights by failing to "create, invoke, and/or utilize procedures . . . to definitively assess whether a suspect . . . was armed and/or posed a threat to police officers or to the public at large, before using deadly force or assault vehicles against that suspect" (Third Am. Compl. ¶ 23);

(3)     the County and the Officer Defendants violated Mr. Genet's civil rights by using excessive force to apprehend him, "which included the August 5, 2008 use of a tank to destroy the entrance of his home and the use of deadly force when Mr. Genet tried to flee" (Third Am. Compl. ¶ 24);

---

[8]    In this excerpt from the Third Amended Complaint, additions are underlined and deletions are struck through, as compared to the Second Amended Complaint:

        10.  On or about August 5, 2008, on Toledo Terrace, Hyattsville, Maryland, in Prince George's County, the Defendant's police officer employees, including Defendants Corporals Delvon Montue, Troy Wallace, Louis Williams, and Thomas Hammill shot the decedent Brook T. Genet multiple times. The decedent died from the ~~his~~ gunshot wounds on August 5, 2008. <u>Thereby depriving him the constitutional right to life guaranteed by the First Amendment of the Bill of Rights to the U.S. Constitution.</u>

        11.  The above described <u>actions</u> ~~acts~~ of the Defendant's police officer employees were willful, malicious, <u>excessive</u> and unlawful and constituted an unjustifiable <u>deprivation of right to life of</u> ~~assault and battery upon~~ the decedent, <u>represents</u> ~~represented~~ unnecessary, <u>unjustifiable</u> and excessive force, and <u>is</u> ~~were~~ contrary to and <u>violates normal</u> ~~violated prudent~~ police procedures. In addition, said acts were committed with actual malice and oppression in an intentional and calculated manner toward the decedent with the unjustified intent to willfully injure him, <u>as</u> ~~and~~ such acts were ratified by the Defendant.

        12.  That as a direct and proximate result of the aforesaid <u>civil right violation</u> ~~assault, battery~~ and use of excessive force, the decedent Brook T. Genet endured severe pain and suffering prior to his death.

(Third Am. Compl. ¶¶ 10-12 (underlining and striking through added).)

(4)     the County and the Officer Defendants violated Mr. Genet's civil rights by

        shooting him multiple times and killing him (Third Am. Compl. ¶ 10);

(5)     the County and the Officer Defendants violated Mr. Genet's civil rights by

        willfully, maliciously, excessively, oppressively, intentionally and unlawfully

        taking Mr. Genet's life through unnecessary, unjustifiable and excessive force in

        violation of normal police procedures (Third Am. Compl. ¶ 11); and

(6)     the County and the Officer Defendants violated Mr. Genet's civil rights by

        subjecting him to "severe pain and suffering prior to his death" (Third Am.

        Compl. ¶ 12.).

Section 1983 "is not itself a source of substantive rights, but merely provides a method

for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94

(1989) (internal quotation marks omitted). In Count IV, Plaintiff effectively cites the Fourth

Amendment's prohibition against unreasonable seizures of the person as a basis for a § 1983

claim. (Third Am. Compl. ¶¶ 22-24.) In Count I, however, Plaintiff ineffectively cites a supposed

"right to life guaranteed by the First Amendment of the Bill of Rights to the U.S. Constitution."

(*Id.* at ¶ 10; *see also id.* at ¶ 11 (claiming Defendant's actions constituted a "deprivation of [the]

right to life of the decedent"); Pl.'s Opp'n 1.) Under the relaxed standards to which *pro se*

litigants are held, [9] the Court will construe all of Plaintiff's civil rights claims as invoking the

Fourth Amendment, because "*all* claims that law enforcement officers have used excessive force

---

[9]     As this District has recognized:

        It is well-settled that *pro se* litigants must be held to less stringent standards than
        trained lawyers, and that a Court must afford a *pro se* complaint generous
        construction. *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam); *Gordon v.
        Leeke,* 574 F.2d 1147 (4th Cir. 1978). However, these principles are not without
        limits. *Beaudett v. City of Hampton,* 775 F.2d 1274, 1278 (4th Cir.1985). Thus, a *pro
        se* litigant must nevertheless fairly put a defendant on notice of the claims being
        asserted and the essential bases therefor.

    *Engle v. United States*, 736 F. Supp. 670, 671-72 (D. Md. 1989).

– deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard." *Graham*, 490 U.S. at 395.

### a. The Officer Defendants

The Officer Defendants argue that their actions did not violate Mr. Genet's Fourth Amendment rights because their actions were "objectively reasonable in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397. (*See* Defs.' Mot. 9-14.) In the alternative, the Officer Defendants argue, they are entitled to qualified immunity. (*See id.*) "Determining the reasonableness of the challenged actions 'requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake.'" *Carr v. Deeds*, 453 F.3d 593, 600 (4th Cir. 2006) (quoting *Graham*, 490 U.S. at 396). Factors to consider in balancing these interests include "whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* Finally, the consideration must be made from the perspective of the Officer Defendants at the time, because police officers in such situations are called upon to make "split-second judgments" under "circumstances that are tense, uncertain, and rapidly evolving." *Waterman v. Batton,* 393 F.3d 471, 476-77 (4th Cir. 2005).

"A police officer may use deadly force when the officer has sound reason to believe that a suspect poses a threat of serious physical harm to the officer or others." *Elliott v. Leavitt*, 99 F.3d 640, 642 (4th Cir. 1996) (citing *Tennessee v. Garner*, 471 U.S. 1, 11 (1985)). Here, the Officer Defendants' sound reason to believe that Mr. Genet posed a threat of serious physical harm was based on several events. Preliminarily, all the officers observed that Mr. Genet was

armed with a handgun, a Browning CZ83 9mm, both while inside his apartment and while running from the apartment. (*See* Abuelhawa Interview lines 101-26; D'Ambrosi Interview lines 52-61, 187-93; Sprague Interview lines 67-69, 75-89; Montue Interview lines 445-69; Wallace Interview lines 196-201, 231-49; Williams Interview lines 250-343; Hammill Interview lines 352-76, 511-38, 568-84, 696-704; Investigation Summary 4.) Also, Mr. Genet fired on the "Bearcat" armored vehicle with at least eight officers inside. (*See* Hammill Interview lines 352-76; Abuelhawa Interview lines 115-21; Williams Interview lines 264-67.)

Cpl. Hammill attempted to fire on Mr. Genet when he jumped out of the apartment holding the gun – though Cpl. Hammill's gun jammed. (*See* Hammill Interview lines 542-44.) Cpls. Montue, Wallace and Williams fired on Mr. Genet when he rounded the corner of the apartment building, raising the gun towards the officers. (*See* Montue Interview lines 452-54 ("[Mr. Genet's] eyes met mine and they opened up wide and he pointed at me and then at that point in time I fired my weapon."); Wallace Interview lines 232-36 ("[Mr. Genet] was coming up at the time with the gun. Ah, once I saw that he was – he had the gun in his hand and he's starting to come up motioning towards us with the gun pointing it at us, then that's when I ah, discharged my weapon."); Williams Interview lines 319-20, 359-62 ("From my vantage point I see [Mr. Genet] raise his weapon up . . . seeing him raise the weapon, I'm thinking he's going to shoot either Corporal Montue, Corporal Pryor, [or] myself. . . ."); Hammill Interview lines 517-74 ("When [Mr. Genet] sees [the officers at the corner] he's turning his body to look but his gun is in his hand so he's turning his body with the gun in his hand towards the uh, officers around the corner of that building.").) When he was shot, Mr. Genet was within a few yards of the officers at the corner. (*See* Montue Interview lines 563-66 (three feet); Wallace interview lines 303-05 (ten feet); Williams Interview lines 323-27 (three to seven yards).) The officers had

nowhere to shield themselves, and Mr. Genet could have harmed them. (*See* Montue Interview

lines 638-41; Wallace Interview lines 251-59; Williams Interview lines 329-33, 357-62.)

Plaintiff presents some evidence, ostensibly to suggest Mr. Genet did not have a gun in

his hand when he fled his apartment. (*See* Pl.'s Opp'n 3.) A patrol officer maintaining the

perimeter behind the Special Operations Division officers stated, "I saw the suspect coming right

at me and I got behind a tree so I wouldn't get in anybody's way." (Acosta Interview lines 39-

45.) The officer stated, "I can't tell you if he had a weapon or not . . . [i]t was too dark" (Acosta

Interview lines 87, 93.) A civilian witness in a nearby building said he "didn't see anything in

[Mr. Genet's] hands," reiterating, "I don't know whether he had a weapon in his hand, I don't

know if his hands was empty or whatever." (Blide Interview lines 255, 272-73.)[10] Another

civilian witness, Mr. Berhe's girlfriend, who was evacuated to another apartment complex 250

feet away, said that she "didn't see [Mr. Genet] with a weapon in his hand." (Styles Interview

lines 106-19.) These statements, rife with equivocation, do not go far enough to create a genuine

issue of material fact as to the reasonableness of the Officer Defendants' actions.

"The Fourth Amendment does not require police officers to wait until a suspect shoots to

confirm that a serious threat of harm exists." *Elliott*, 99 F.3d at 643. The Officer Defendants

were confronted by an armed suspect who had shot at County Police earlier in the evening. They

had sound reason to believe Mr. Genet posed a threat of serious physical harm to them. "No

citizen can fairly expect to draw a gun on police without risking tragic consequences. And no

court can expect any human being to remain passive in the face of an active threat on his or her

life." *Elliott*, 99 F.3d at 644. Because there is no genuine question that the Officer Defendants'

---

[10]   Plaintiff suggests this witness' statement also stands for the proposition that Mr. Genet had his hands up. The
witness stated, that he didn't "know whether [Mr. Genet] threw his hands up or not, but he was moving . . .
[l]ike normally when you're running – you know running in position your hands go up and down or whatever."
(Blide Interview lines 252-68.)

actions were "objectively reasonable in light of the facts and circumstances confronting them," *Graham*, 490 U.S. at 397, summary judgment in their favor on Counts I and IV is appropriate.

### b. The County

The County argues that it cannot be held liable for alleged violations of Mr. Genet's Fourth Amendment rights because Plaintiff cannot identify a County "policy or custom" that institutionalizes or authorizes such a violation.[11] In drafting Section 1983:

> Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort. In particular, we conclude that a municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory.

*Monell v. Dep't of Social Services*, 436 U.S. 658, 691 (1978). Accordingly, "[l]iability arises only where the constitutionally offensive acts of [County] employees are taken in furtherance of some municipal 'policy or custom.'" *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984). Plaintiff points to no County policy or custom that constitutes a violation of Mr. Genet's civil rights. Plaintiff provides no facts to suggest there is such a policy, beyond simply rehashing the tragic events of August 5, 2008 and resting on "the mere allegations or denials of [her] pleadings." *Bouchat*, 346 F.3d at 522. Accordingly, as there is no genuine issue of material fact as to the County's liability for Plaintiff's civil rights claims, summary judgment in its favor on Counts I and IV is appropriate.

---

[11] The County also argues, as it has before, that Plaintiff has erred by naming "Prince George's County Police Department" as a defendant. (Defs.' Mot. 14-15.) The original Complaint, however, as well as the first two amended complaints, names "Prince George's County Government." Under the relaxed pleading standards allowed to *pro se* litigants, and in light of the fact that Plaintiff cured this supposed deficiency in her Third Amended Complaint, the Court will treat the Complaint as having properly named the County as a defendant.

## II. Negligence (Count II)

### a. The Officer Defendants

The Officer Defendants argue that because they acted without malice, they are entitled to immunity under Maryland law.[12] (Defs.' Mot. 19-21.) Police officers in Maryland are "public officials" who act in a discretionary capacity. *See Bradshaw v. Prince George's County*, 396 A.2d 255, 260-61 (Md. 1979); *see also Williams v. Mayor & City Council of Balt.*, 753 A.2d 41, 61 (Md. 2000). When acting in the scope of their official duties, in the absence of malice, they are immune from tort liability. *See* Md. Code Ann., Cts. & Jud. Proc. § 5-507(b)(1); *Williams*, 753 A.2d at 61; *DiPino v. Davis*, 729 A.2d 354, 370 (Md. 1999); *Bradshaw*, 396 A.2d at 260-61; *accord Gray-Hopkins v. Prince George's County*, 309 F.3d 224, 233 (4th Cir. 2002). The Officer Defendants were undisputedly serving in an official capacity. (*See* Third Am. Compl. ¶ 7 (corresponding to First Am. Compl. ¶ 4); Officer Defs.' Answer to Pl.'s First Am. Compl. [Paper No. 13] ¶ 4 (admitting the Officer Defendants "were acting within the scope of their employment as police officers, and were the agents, servants and employees of Prince George's County, Maryland at the time of the incident that forms the basis of Plaintiff's Amended Complaint").) Accordingly, the Officer Defendants enjoy immunity unless they acted with malice.

Plaintiff does not use the word "malice," though she does allege that the Officer Defendants acted "willfully, wantonly and with gross indifference and reckless disregard to the consequences of their actions and the rights and safety of the decedent." (Third Am. Compl. ¶

---

[12] The Officer Defendants, in their argument on Count II, invoke their argument on Count I of the Second Amended Complaint. (Defs.' Mot. 21.) As discussed *supra*, note 8 and accompanying text, in the Third Amended Complaint, Count I changed from a state law tort claim for battery to a civil rights claim. As discussed *supra*, page 2, leave was granted to file the Third Amended Complaint on the condition that Defendants' Motion would be treated as a Motion to Dismiss, or, in the alternative, for Summary Judgment, of the Third Amended Complaint. Thus, Defendant's general arguments on all state law tort issues will be applied to all of Plaintiff's state law tort claims, regardless of the numbering of each count of the complaints.

14.) Under the relaxed pleading standards afforded to *pro se* litigants, the Court will construe this allegation as an implication of the "malice" needed to overcome Maryland public official immunity. Plaintiff's evidence of the alleged willful, wanton, reckless and grossly indifferent conduct of the Officer Defendants is found in the same facts relevant to the civil rights claims.

While the facts discussed *supra*, Analysis Part I, confirm that the Officer Defendants acted reasonably in the face of a threat of serious bodily harm, the Fourth Amendment inquiry of "objective reasonableness" does not embrace subjective concepts such as malice. *Graham*, 490 U.S. at 399; *see also Shoemaker v. Smith*, 725 A.2d 549, 558 (Md. 1999) (declaring that showing malice is "[u]nlike the judicially-fashioned purely objective tests for immunity under § 1983"). To show malice, a plaintiff must "point to specific evidence that raises an inference that the defendant's actions were improperly motivated," and that Defendant "'intentionally performed an act without legal justification or excuse, but with an evil or rancorous motive influenced by hate.'" *Thacker v. City of Hyattsville*, 762 A.2d 172, 189-90 (Md. Ct. Spec. App. 2000) (quoting *Shoemaker*, 725 A.2d at 560). There is no allegation or evidence that the Officer Defendants acted in hate, or with an evil or rancorous motive, and accordingly there is no genuine issue of material fact to contradict the Officer Defendant's public official immunity under Maryland law. Therefore, summary judgment in favor of the Officer Defendants on Count II is appropriate.

### b. The County

The County is immune from liability for its tortious conduct when it acts in a governmental capacity. *See DiPino*, 729 A.2d at 370; *accord Gray-Hopkins*, 309 F.3d at 234. Enforcing the criminal law is "quintessentially governmental in nature." *DiPino*, 729 A.2d at 370. Accordingly, there is no genuine question that the County is entitled to governmental immunity, and summary judgment in its favor on Count II is appropriate.

### III.    Wrongful Death (Count III)

The Officer Defendants and the County argue that because there is no genuine question on their lack of negligence, Plaintiff cannot sustain an action for wrongful death.[13] (Defs.' Mot. 21-22.) As discussed *supra*, Analysis Part II, the Officer Defendants and the County are immune from liability for their negligence. For the same reasons, they are immune from liability for the claim of wrongful death. *See McCoy v. Hatmaker*, 763 A.2d 1233, 1247-48 (Md. Ct. Spec. App. 2000) (granting summary judgment on wrongful death claim pursuant to several defenses, including Maryland public official immunity based on a lack of malice). With no genuine issue of material fact on the County and the Officer Defendants' entitlement to immunity to the wrongful death claim, summary judgment in their favor on Count III is appropriate.

### IV.    The Civilian Defendants

"[I]t is well established that a court has broad inherent power *sua sponte* to dismiss an action, or part of an action, which is frivolous." *Jones v. Commissioner*, 100 A.F.T.R.2d (RIA) 2007-6554, 6555 (D. Md. Aug. 23, 2007) (citing *Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362, 363-64 (2d Cir. 2000) (district courts have authority to dismiss frivolous claims *sua sponte*, notwithstanding payment of the filing fee); *Crowley Cutlery Co. v. United States*, 849 F.2d 273, 277 (7th Cir. 1988) (district courts have authority to dismiss frivolous claims *sua sponte*); *Brown v. District Unemployment Compensation Board*, 411 F. Supp. 1001 (D.D.C. 1975) (district courts have inherent power to control the judicial process and dismiss frivolous claims *sua sponte*)). As detailed herein, Plaintiff's claims against the Civilian Defendants are frivolous, and will be dismissed *sua sponte* in the order accompanying this opinion.

---

[13]    *See generally* Md. Code Ann., Cts. & Jud. Proc. § 3-901 to -904 (establishing the wrongful death cause of action); *Benjamin*, 873 A.2d at 480 (discussing the cause of action and comparing it to survival actions).

Count V of the Third Amended Complaint names the Civilian Defendants only.[14] (*See* Third Am. Compl. ¶¶ 25-27.) Count V alleges "Malicious Use of Prosecution" against the Civilian defendants for "falsely reporting that Brook had shot at them. . . . in an attempt to have the police officers arrest, wound, or kill Brook Genet." (Third Am. Compl. ¶ 26.) To make a malicious prosecution claim in Maryland, Plaintiff must show: "(1) that a criminal proceeding was instituted or continued by the defendant against the plaintiff, (2) that the proceeding terminated in favor of the plaintiff, (3) the absence of probable cause for the proceeding, and (4) malice, meaning that a primary purpose in instituting the proceeding was other than that of bringing the plaintiff to justice." *DiPino v. Davis*, 729 A.2d 354, 373 (Md. 1999).

Read liberally, as *pro se* litigant's allegations must be, Count V may also be construed as a claim for abuse of process. To make an abuse of process claim in Maryland, Plaintiff must show: "[(1)] that the defendant wilfully [sic] used process after it has issued in a manner not contemplated by law, [(2)] that the defendant acted to satisfy an ulterior motive; and [(3)] that damages resulted from the defendant's perverted use of process." *One Thousand Fleet Ltd. v. Guerriero*, 694 A.2d 952, 956 (Md. 1997).

Fatal to either construction of Plaintiff's complaint is that the Civilian Defendants never instituted criminal proceedings, or legal process of any kind, against Mr. Genet. *See generally* Third Am. Comp. ¶¶ 6, 26 (alleging only that the Civilian Defendants called County Police). In fact, when an officer advised Mr. Berhe that the only way County Police could help recover the rental car was to apply for a warrant from a Maryland District Court Commissioner, Mr. Berhe requested that the officer not do so – forestalling any initiation of legal process against

---

[14]   In her prayers for relief for Counts I through IV, Plaintiff seeks compensatory damages from only the County and the Officer Defendants, but punitive damages from all defendants. (*See* Third Am. Compl. 6-7.) In the context of the entire Complaint, the demand for punitive damages from the Civilian Defendants for Counts I through IV is misplaced, and the Court construes only Count V to be a claim against the Civilian Defendants.

Mr. Genet. (*See* Berhe Interview ¶¶ A13, A15-A16; Robinson Interview lines 103-24.) Because there are no facts that would allow Plaintiff to state a claim against the Civilian Defendants for malicious prosecution or abuse of process under Maryland law, her claims are frivolous, and will be dismissed *sua sponte*.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court will, by separate order, grant Plaintiff's Motion for Leave to File a Suprreply [Paper No. 32], grant Defendants Prince George's County, Maryland, and County Police Corporals Delvon Montue, Troy Wallace, Louis Williams and Thomas Hammill's Motion to Dismiss, or, in the Alternative, for Summary Judgment [Paper No. 22], and dismiss the Plaintiff's frivolous claims against the Civilian Defendants *sua sponte*, pursuant to the Court's inherent authority to do so.


Date:  July 8, 2010


                                              /s/
                                    ROGER W. TITUS
                                    UNITED STATES DISTRICT JUDGE